Order Entered.

*Patrick M. Flatley*
Patrick M. Flatley
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| In re: | ) |
| | ) |
| EMERALD GRANDE, LLC, | ) Case No. 17-bk-21 |
| | ) |
| Debtor. | ) Chapter 11 |
| | ) |

## MEMORANDUM OPINION

First Bank of Charleston, Inc. ("First Bank"), and Carter Bank and Trust ("Carter Bank") (together, the "Creditors") seek to convert the Debtor's Chapter 11 case under § 1112(b) of the Bankruptcy Code. The Debtor opposes conversion and argues that its case should proceed under Chapter 11. On April 26, 2018, the court held an evidentiary hearing to consider the motion to convert, and the parties simultaneously submitted post-trial briefing on May 11, 2018. The matter is now ripe for disposition.

For the reasons stated herein, the court will deny the Creditors' motion to convert.

## I. BACKGROUND

The Debtor owns several parcels of real estate, including a real estate development in the Kanawha Landing Shopping Center Complex in Charleston, West Virginia, which includes two restaurants and a Verizon Wireless store ("Kanawha Landing"). The Debtor also owns an unencumbered and undeveloped 1.758 acre parcel of real property in Kanawha Landing (the "Unencumbered Parcel") and two hotels operating as La Quinta Inn and Suites, one in Elkview, West Virginia, and the other in Summersville, West Virginia (respectively, the "Elkview Hotel" and the "Summersville Hotel").

In June 2016, a flood washed away the bridge providing access to the Elkview Hotel and the property of a related debtor, Tara Retail Group, LLC ("Tara"),[1] rendering the property

---

[1] Tara is a single-asset real estate company that is purportedly managed and operated by the Debtor's sole member and manager, William Abruzzino.

1

inaccessible and inoperable from June 2016 to August 2017. In December 2016, Carter Bank issued a notice of foreclosure sale for the Summersville Hotel but not the Elkview Hotel. The Debtor filed for bankruptcy on January 11, 2017, to prevent the foreclosure sale. On February 17, 2017, the court entered an order approving the Debtor's employment of a broker and real estate agent to list the Unencumbered Parcel for sale. The debtor marketed the property for $850,000 based on a recommendation from the broker/agent, who formed the recommendation in that regard based at least in part on an appraisal commissioned by First Bank on May 17, 2016. On March 20, 2017, First Bank filed a proof of claim for $1,983,878.77, which is secured by Kanawha Landing and the cash generated thereby. On the same day, Carter Bank filed a proof of claim for $10,749,455.99, which is secured by the hotels and the income they produce. After the Debtor and Tara each filed bankruptcy, Tara obtained financing to restore access to its property and the Elkview Hotel. The Elkview Hotel reopened on August 22, 2017. The Debtor then filed a disclosure statement and plan of reorganization on September 8, 2017.

The court extended the deadline for objections to the disclosure statement to December 8, 2017, to account for settlement negotiations between the Debtor and Carter Bank. The court also extended the Debtor's time to file an amended disclosure statement and plan to January 31, 2018. On February 7, the court granted the Debtor's request to further extend the January 31 deadline to March 9. After several months of negotiations, the Debtor filed a disclosure statement and plan of liquidation under Chapter 11 of the Bankruptcy Code, which the Debtor felt at the time would maximize the value of the collateral and recovery for creditors within a reasonable period of time.

On March 26, the Creditors, seemingly unhappy with the Debtor's proposal, filed a motion to convert the Debtor's case. At that time, and still, several matters remain pending before the court, including the Debtor's objection to First Bank's proof of claim, Carter Bank's motion for relief from stay and abandonment, the Debtor's second amended disclosure statement, Tara's motion to determine the reasonable value of services and award an administrative expense claim for the repair of the bridge, and the Debtor's motion to surcharge Carter Bank's collateral for the bridge repair costs if Tara succeeds on its administrative claim.

## II. ANALYSIS

The Creditors argue that cause exists to convert the Debtor's case because of the continued diminution of the estate and absence of a reasonable likelihood of rehabilitation, the Debtor's alleged administrative insolvency, and the Debtor's alleged gross mismanagement of its estate.

The Debtor argues that its case should remain in Chapter 11 because it is now operating with a positive monthly cash flow, its administrative costs will be addressed through a new plan and cash infusion by Mr. Abruzzino, and that it has not grossly mismanaged its estate.

Section 1112(b)(1) of the Bankruptcy Code provides that the court "shall" convert a case under Chapter 11 to a case under Chapter 7 if the movant establishes "cause" and shows that conversion is in the best interest of the creditors. 11 U.S.C. § 1112(b)(1). The movant bears the initial burden of demonstrating that cause exists under § 1112(b). *In re Burgess*, No. 11-1257, 2013 WL 5874616, at *1 (Bankr. N.D.W. Va. Oct. 30, 2013). Bankruptcy judges have wide discretion to determine whether cause exists to convert a case under section 1112(b). *In re BH S & B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) (citing *In re Kholyavka*, No. 08–10653DWS, 2008 WL 3887653, at *5 (Bankr. E.D. Pa. Aug. 20, 2008)). If the movant establishes cause, the court will convert the case unless the non-moving party can show that "unusual circumstances exist such that [conversion] is not in the best interest of creditors." *In re Quail Farm, LLC*, No. 09-BK-298, 2010 WL 1849867, at *2 (Bankr. N.D.W. Va. May 5, 2010).

Cause for conversion under § 1112(b)(4)(A) exists when (1) the estate suffers from "substantial or continuing loss or diminution" and (2) there is no "reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Both elements must be present to establish cause. *Id.* To determine whether there is a substantial or continuing loss or diminution, "the court first looks at whether a debtor has negative cash flow or declining asset values; if so, the court considers whether the debtor will be able to 'stop the bleeding' and return to solid financial footing within a reasonable amount of time." *In re Burgess*, 2013 WL 5874616, at *2 (citing 7 Collier on Bankruptcy ¶ 1112 .04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)). As for the second element, rehabilitation "contemplates the successful maintenance or re-establishment of the debtor's business operations." *In re Quail Farm, LLC*, 2010 WL 1849867, at *4 (quoting *Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 88 (Bankr. S.D. Ga. 2009)). Rehabilitation does not necessarily equal reorganization; they are distinct, but related, concepts. *Id.* "Because a Chapter 11 plan of reorganization may include liquidation, the test under § 1112(b)(4)(A) is not whether the debtor can confirm a plan, but, rather, 'whether the debtor's business prospects justify continuance of the reorganization effort.'" *Id.* (quoting *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. at 88). As a result, rehabilitation requires, "at minimum, the prospect of re-establishing a business." *Id.*

3

(quoting *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. at 88). "Finally, when a debtor proposes to reorganize by continuing to do business as opposed to liquidation, the court must concern itself with whether the 'debtor has formulated, or can formulate within a reasonable amount of time, a reasonably detailed business plan.'" *Id.* (citing 7 Collier on Bankruptcy ¶ 1112.04[6][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010)). Notably, a debtor's administrative insolvency can demonstrate cause under § 1112(b)(4)(A) or serve as independent cause for conversion, although not explicitly listed in the statute. *See In re BH S & B Holdings, LLC*, 439 B.R. at 349.

Post-petition gross mismanagement of the estate is also cause for conversion. 11 U.S.C. § 1112(b)(4)(B); *In re Creech*, 538 B.R. 245, 250–51 (Bankr. E.D.N.C. 2015). "This subsection focuses on the conduct of the estate's affairs (not the debtor's) and requires that the mismanagement be 'gross' in character, meaning that the mismanagement is 'glaringly noticeable usu[ally] because of inexcusable badness or objectionableness.'" *In re 210 W. Liberty Holdings, LLC*, No. 08-677, 2009 WL 1522047, at *5 (Bankr. N.D.W. Va. May 29, 2009) (citing Webster's Ninth New Collegiate Dictionary 538 (1991)). The United States Bankruptcy Court for the Eastern District of North Carolina notes that

> [c]ourts have generally found gross mismanagement of the estate where debtors fail to seek court approval before taking certain actions outside the ordinary course of business, such as paying prepetition debts or incurring debt, where debtors file monthly reports without closely monitoring them, and where the business lacks effective management.

*In re Creech*, 538 B.R. at 251. For example, this court found gross mismanagement of an estate where the debtor refused to pursue collection of an estate asset (or provide a compelling reason why the asset was not pursued), transferred funds to third parties without full, timely disclosure to the court and parties or approval by the court, and failed to remedy its restaurant's violations of the fire code. *In re 210 W. Liberty Holdings, LLC*, 2009 WL 1522047, at *6.

Here, the Creditors' arguments regarding diminution of the estate, the absence of a reasonable likelihood of rehabilitation, and administrative insolvency all center upon the estate's continued administrative expenses, including postpetition property taxes, La Quinta franchising fees, attorney's fees and expenses, and Tara's administrative expense claim for rebuilding the bridge that provided access to Tara's property and the adjacent Elkview Hotel. The Debtor has two main income sources: Kanawha Landing and the two hotels. Kanawha Landing had positive

cash flow both before and after the Debtor filed its bankruptcy petition and was unaffected by the flood. As a result, the court will look solely to the hotel properties in determining the estate's diminution and likelihood of rehabilitation. After all, that is also the focus of the Creditors.

Whether cause exists under § 1112(b)(4)(A) is a matter of perspective in this case. For instance, the Creditors urge the court to examine the estate from its inception seventeen months ago. But using only the last several months provides a much different perspective, which the court finds better informs its decision under § 1112(b)(4)(A). Specifically, one-half of the Debtor's hotel business, the Elkview Hotel, was rendered inoperable by the flood in June 2016. It remained closed until Tara restored access to it in August 2017. This substantially impaired the Debtor's ability to service its debt to Carter Bank and to produce income. The Elkview Hotel was slow to restore pre-flood cash flow as it entered the fall and then the slow winter season after being closed several months. Within the last few months, however, the hotel has experienced increased revenues and appears to be on an upward trajectory. Moreover, the Debtor's operation of both hotels reflects net income in excess of its projections and growth in that regard for at least the last three months. For instance, the Debtor exceeded projections on its reported combined unrestricted cash balances for the Elkview Hotel and the Summersville Hotel for January, February, and March 2018.[2] Although it is uncertain whether the Debtor can obtain confirmation of a plan and ultimately be successful post-bankruptcy, the court finds its performance, particularly in 2018, to warrant it remaining in Chapter 11. Notably, this case is nearing its logical end, as the Debtor will either obtain confirmation within a reasonable time or it will not.

As for administrative expenses in the case, the court cannot determine at this time that the expenses cause the estate to actually be administratively insolvent. For instance, a substantial portion of administrative expenses are attorney's fees and potentially the claim of Tara. Notably, however, administrative claim holders may agree to treatment other than that required under §

---

[2] The following figures indicate the Debtor's ending unrestricted cash balances for its hotel operations, including both the Summersville Hotel and the Elkview Hotel, as reported by its accountant:

January - $87,965, or $81,015 over its initial estimates.

February - $114,345, or $81,048 over its initial estimates.

March - $150,702, or $100,177 over its initial estimates.

5

1129(a)(9)(A), including the deferred treatment of their claims, and the Debtor proposes to surcharge Carter Bank for Tara's claim. The Debtor also expressed plans in its briefing for its principal, Mr. Abruzzino, to infuse sufficient capital into the Debtor to satisfy the postpetition taxes and franchise fees on the Summersville Hotel. Furthermore, the Debtor still possesses the Unencumbered Parcel that the debtor has marketed at $850,000 since February 2017 based on a recommendation from its broker/agent. The court, therefore, cannot determine whether the estate is administratively insolvent because the allowed amounts of administrative claims, what treatment they will receive, or what treatment the claimholders will accept in connection with a plan have yet to be determined.

Moreover, the court is unpersuaded by the Creditors' reliance on *BH S & B Holdings*. In *BH S & B Holdings*, the United States Trustee's Office filed a motion to convert based upon the debtors filing misleading or deficient monthly operating reports, the debtors' being administratively insolvent, and the debtors failing to timely file a reorganization plan and disclosure statement. The debtors in that case had closed their stores and ceased operations, attempted to liquidate all of their assets under Chapter 11, and had not filed a liquidation plan as of the date of the court's opinion, even though the deadline for filing a proposed disclosure statement and plan had elapsed by seven months. Moreover, the debtor failed to make any progress in resolving litigation claims while exhausting $1 million for professional fees set aside in a fund to pursue such claims. Indeed, the prime reason that the case remained in a Chapter 11 up to that point was to facilitate recovery upon the litigation claims.

Success for the Debtor in this Chapter 11 case is not dependent upon speculative litigation claims as it was for the debtor in *BH S & B Holdings*. Here, the Debtor continues to operate its businesses and has exceeded income projections for the past several months. Indeed, a fair reading of the evidence demonstrates that, contrary to a lack of rehabilitation being demonstrated by the Creditors, the Debtor has plausibly demonstrated that it is making progress at placing itself on firmer financial footing and improving its operations. It is far from certain whether a successful reorganization can yet be achieved, but that is not the standard by which an allegation under § 1112(b)(4)(A) is adjudged. The Debtor has indicated that it will quickly formulate an amended

plan and disclosure statement.[3]  Thus, soon, it is to be hoped, the court and the parties will be addressing the ultimate question of reorganization: can the Debtor obtain confirmation?

Finally, the court finds that the Creditors have not demonstrated that the Debtor has grossly mismanaged its estate.  The Creditors' main contention in that regard is that the Debtor should not support Tara's administrative expense claim for part of the cost associated with rebuilding the bridge to Tara's property and the Elkview Hotel.  The choice of the Debtor to support or oppose Tara's claim is well-within its discretion as it navigates its case.  Such support bears no indication as to the quality of the estate's management of its assets or the operation of its business.  It may well be reasonable to support such a claim for at least part of the bridge's construction costs when the Debtor's Elkview Hotel was shuttered without commercially-reasonable access prior to Tara restoring access.  Moreover, the merits of Tara's claim have yet to be litigated and, despite the fumbling and inconsistent approach by the Debtor's special counsel in that regard, the court presently cannot disregard or ostracize the Debtor's approach.[4]  In any event, the court cannot say that the Debtor's litigation position constitutes mismanagement, let alone gross mismanagement.

### III. CONCLUSION

As a result, the court finds that the Creditors have failed to meet their burden to demonstrate that cause exists at this time to convert the Debtor's case to one under Chapter 7 of the Bankruptcy Code.  Consequently, the court need not address whether unusual circumstances exist such that conversion is not in the best interest of creditors.

Based on the foregoing, the court will enter a separate order denying the Creditors' Motion to Convert.

---

[3] The court notes that the Debtor would be well-advised to assiduously formulate and file, in short order, an amended disclosure statement and plan.

[4] One must keep in mind that counsel's compensation is in the hands of the court and is awarded, among other things, based on a consideration of "the nature, the extent, and the value" of the services rendered.  11 U.S.C. § 330(a)(3).