# EXHIBIT B
# Asset Purchase Agreement

# ASSET PURCHASE AGREEMENT

By and Between

## EMERALD GRANDE, LLC, as Seller

and

## WILD PARTNERS, as Purchaser

Dated as of March 16, 2021

for the

Property:

## 1.758 acres of property adjacent to Lowes Hardware Store in Kanawha City, WV

Exhibit B

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of this __ day of March, 2021, by and between Emerald Grande, LLC, a Georgia limited liability company ("**Seller**"), and Wild Partners, a Tennessee general partnership, or its assigns ("**Purchaser**"). Seller and Purchaser are sometimes referred to herein individually as a "**Party**", and collectively as the "**Parties**".

**WHEREAS,**

A.      Seller is the owner of 1.758 acres of property adjacent to Lowes Hardware Store in Charleston, Kanawha City, West Virginia (the "**Transferred Property**").

B.      Seller desires to sell the Transferred Property to Purchaser, and Purchaser desires to purchase the Transferred Property from Seller, on the terms set forth in this Agreement and subject to entry of the Sale Order (as hereinafter defined) by the United States Bankruptcy Court for the Northern District of West Virginia (the "**Bankruptcy Court**").

**NOW, THEREFORE,** in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1      Definitions**.  The following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"Agreement" has the meaning set forth in the introductory paragraph.

"Applicable Law" means (i) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Sale Order" has the meaning set forth in Section 4.4.

"Broker" means REALCORP.

"Business Day" means any day other than a Saturday, Sunday or federal legal holiday in the United States.

"Closing" has the meaning set forth in Section 9.1.

"Closing Date" has the meaning set forth in Section 9.1.

"Closing Statement" has the meaning set forth in Section 10.1.

**Exhibit B**

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Deed" has the meaning set forth in Section 9.2.1(b).

"Deposit" has the meaning set forth in Section 3.2.1.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1.

"Effective Date" shall be the date of last execution by a party to this Agreement.

"Escrow Agent" means Spilman Thomas & Battle, PLLC

"Governmental Authority" means any federal, state or local government or other political subdivision, agency or office thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"Hazardous Substances" means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by products and polychlorinated biphenyls as regulated by Environmental Laws.

"Knowledge" means (i) with respect to Purchaser, the actual knowledge of Jonathan Yates, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Seller or any of its Affiliates, and (ii) with respect to Seller, (A) the actual knowledge of William Abruzzino, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Purchaser or any of its Affiliates, (B) any matter disclosed in any exhibits or schedules to this Agreement, (C) any matter disclosed in any Seller Due Diligence Materials received by or made available to Purchaser prior to Closing or any other documents or materials provided by Seller to Purchaser prior to Closing, and (D) any matter disclosed by the Inspections or in the Purchaser Due Diligence Reports received by or made available to Purchaser prior to Closing. For the purposes of this definition, the term "actual knowledge" means, with respect to any person, the conscious awareness of such person at the time in question, and expressly excludes any constructive or implied knowledge of such person.

"Notice" has the meaning set forth in Section 14.1.1.

"Party" and "Parties" has the meaning set forth in the introductory paragraph.

"Permitted Exceptions" has the meaning set forth in Section 4.2.1.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

**Exhibit B**

"Prohibited Person" has the meaning set forth in Section 6.1.9.

"Property Tax Appeals Matters" has the meaning set forth in Section 7.2.1.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the introductory paragraph.

"Purchaser Closing Conditions" has the meaning set forth in Section 8.1.1.

"Purchaser Closing Deliveries" has the meaning set forth in Section 9.2.2.

"Purchaser Default" has the meaning set forth in Section 11.3.

"Purchaser Documents" has the meaning set forth in Section 6.2.2.

"Purchaser Due Diligence Reports" means all studies, reports and assessments prepared by any Person for or on behalf of Purchaser (other than any internal studies, reports and assessments prepared by any of Purchaser's employees, attorneys or accountants) in connection with the Inspections.

"Scheduled Closing Date" has the meaning set forth in Section 9.1.

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Closing Conditions" has the meaning set forth in Section 8.2.

"Seller Closing Deliveries" has the meaning set forth in Section 9.2.1.

"Seller Cure Period" has the meaning set forth in Section 11.2.

"Seller Default" has the meaning set forth in Section 11.1.

"Seller Documents" has the meaning set forth in Section 6.1.2.

"Survival Period" has the meaning set forth in Section 13.1.1.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem, employment or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Seller with respect to the Transferred Property including, without limitation, any interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax, or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Title Commitment" has the meaning set forth in Section 4.1.

"Title Company" means Spilman Thomas & Battle PLLC/First American Title

**Exhibit B**

"Title Exceptions" has the meaning set forth in Section 4.2.1.

"Transferred Property" has the meaning set forth in Section 2.1.

## ARTICLE II
## THE TRANSFERRED PROPERTY AND ASSUMED LIABILITIES

**2.1    Description of the Transferred Property**.  Subject to the terms set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, +/- 1.758 acres of unimproved real property in the Kanawha Landing Development, adjacent to the Lowes Hardware Store in Charleston, Kanawha City, West Virginia, as shown on the attached Exhibit (the "**Transferred Property**"):

## ARTICLE III
## PURCHASE PRICE

**3.1    Purchase Price**.

3.1.1    The purchase price for the Transferred Property is Five Hundred Seventy-Five Thousand Dollars ($575,000.00), (the "**Purchase Price**").

**3.2    Earnest Money**.

3.2.1    Deposit of Earnest Money.  The Purchaser shall deposit the amount of Twenty-Five Thousand Dollars ($25,000.00) (the "**Deposit**") with the Escrow Agent which is held in escrow as earnest money.  The Deposit shall be fully applied to the Purchase Price at the Closing, and shall be non-refundable to Purchaser, unless the Transferred Property is sold to an Overbidder, or a Seller Default.

3.2.2    Disbursement of Earnest Money to Seller.  At Closing, Purchaser shall cause Escrow Agent to disburse the Deposit to Seller, and Purchaser shall receive a credit against the Purchase Price in the amount of the Deposit disbursed to Seller.  If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Deposit, then Purchaser shall provide written notice to Escrow Agent with concurrent copy to Seller (or Seller can send written notice to Escrow Agent with concurrent copy to Purchaser), directing Escrow Agent to disburse the Deposit to Seller no later than two (2) Business Days after such termination.  This Section 3.2.2 shall survive the termination of this Agreement.

3.2.3    Refund of Earnest Money to Purchaser.  If this Agreement is terminated and Purchaser is entitled to a refund of the Deposit as provided for in Section 3.2.1, then Seller shall provide written notice to Escrow Agent with concurrent copy to Purchaser (or Purchaser can send written notice to Escrow Agent with concurrent copy to Seller, subject to the terms of the Earnest Money Escrow Agreement) directing Escrow Agent to disburse the Deposit to Purchaser.  This Section 3.2.3 shall survive the termination of this Agreement.

**3.3    Payment of Purchase Price**.

**Exhibit B**

3.3.1   Payment at Closing.  At Closing, Purchaser shall pay, or cause to be paid, to Seller an amount equal to the Purchase Price (as adjusted pursuant to this Agreement), less the Deposit disbursed to Seller.  Purchaser shall cause the wire transfer of funds to be received by Seller on the Closing Date.

3.3.2   Method of Payment.  All amounts to be paid by Purchaser to Seller pursuant to this Agreement shall be paid by wire transfer of immediately available U.S. federal funds.

## ARTICLE IV

## TITLE TO THE TRANSFERRED PROPERTY

**4.1    Title Commitment.** Purchaser shall promptly obtain a commitment for an ALTA owner's title insurance policy from the Title Company for the Transferred Property ("**Title Commitment**").

**4.2    Exceptions to Title.**

4.2.1   Permitted Exceptions.  All liens, encumbrances or other exceptions to title to which the Purchaser does not object prior to the Sale Hearing shall constitute "permitted exceptions" to title to the Transferred Property (the "**Permitted Exceptions**").

**4.3    Conveyance of the Transferred Property.**  At Closing, Seller shall convey its fee simple interest in and to the Transferred Property to Purchaser, subject only to all Permitted Exceptions.

**4.4    Bankruptcy Matters.**

4.4.1   This Agreement is subject to approval by the Bankruptcy Court after notice to creditors, and the consideration by Seller of any higher or better competing bids for the Transferred Property.  This Agreement may be terminated and the purchase and sale of the Transferred Property and the other transactions contemplated by this Agreement may be abandoned at any time prior to the Closing by the Seller by written notice to Purchaser if Seller accepts a Qualified Competing Offer as the successful Overbidder (each as defined in the Sale Motion) from a Person other than Purchaser, after Purchaser has declined to submit a higher and better Qualified Bid.

4.4.2   Seller and Purchaser acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval, and the expiration of any appeal periods of the Sale Order, if any.  Seller will use reasonable efforts to consummate the transactions contemplated hereby by seeking entry of the Sale Order. Within five (5) Business Days of the Effective Date, Seller shall file with the Bankruptcy Court a motion (the "**Sale Motion**") in form and substance reasonably satisfactory to Purchaser seeking entry of an order (i) authorizing and approving the sale of the Transferred Property on the terms and conditions set forth herein, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, free and clear of all liens and encumbrances except Permitted Exceptions, subject to higher and better Qualified Bids submitted by Qualified Bidders (each as defined in

Exhibit B

the sale motion and accompany bidding procedures), and (ii) finding that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and not a successor to Seller, with one or more appropriate motions and the entry of appropriate orders of the Bankruptcy Court (all such motions and orders being in form and substance reasonably satisfactory to Seller, Purchaser, and Title Company, the "**Sale Order**").

4.4.3    If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Sale Order or other such order), and this Agreement has not otherwise been terminated pursuant to the terms of this Agreement, Seller shall use its reasonable best efforts to diligently defend such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

4.4.4    Except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, and to the extent reasonably practicable, Seller shall provide Purchaser with a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court relating to the transaction contemplated by this Agreement, including the motion to approve the Sale Order, no later than three (3) Business Days prior to the filing thereof with the Bankruptcy Court, and all such motions, orders or other pleadings must be in a form mutually acceptable to Purchaser and Seller.

4.4.5    Seller shall consult with Purchaser regarding pleadings that it intends to file with the Bankruptcy Court in connection with the transactions contemplated by this Agreement, or which might reasonably affect the Bankruptcy Court's approval of the transactions herein described and the Sale Order. Seller shall promptly provide Purchaser and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the transactions described herein and the Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser, and its respective counsel. Seller shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Seller's Bankruptcy case has been appealed, in each case, without the prior written consent of Purchaser.

## ARTICLE V
## CONDITION OF THE TRANSFERRED PROPERTY

5.1    **TRANSFERRED PROPERTY SOLD "AS IS".**    PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, (A) THE PURCHASE OF THE TRANSFERRED PROPERTY SHALL BE ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, SUBJECT TO WEAR AND TEAR FROM THE EFFECTIVE DATE UNTIL CLOSING, AND (B) SELLER HAS NO OBLIGATION TO REPAIR ANY DAMAGE TO OR DEFECT IN THE TRANSFERRED PROPERTY, REPLACE ANY OF THE TRANSFERRED PROPERTY OR OTHERWISE

REMEDY ANY MATTER AFFECTING THE CONDITION OF THE TRANSFERRED PROPERTY

### 5.2    Limitation On Representations and Warranties.

5.2.1   Purchaser agrees that, except as expressly set forth herein, Seller shall not be liable for any latent or patent defects in the Transferred Property.  Purchaser acknowledges that neither Seller nor any of the employees, agents or attorneys of Seller has made any verbal or written representations or warranties whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement and, in particular, that no such representations and warranties have been made with respect to the physical or environmental condition of the Transferred Property, the layout or footage of the Transferred Property, zoning, environmental, and other laws, regulations and rules applicable to the Transferred Property, or the compliance of the Transferred Property therewith, or any other matter or thing affecting or relating to the Transferred Property or the transactions contemplated hereby, except as specifically set forth in this Agreement.  Purchaser has not relied and is not relying upon any representations or warranties, other than the representations and warranties expressly set forth in this Agreement, or upon any statements made in any informational materials with respect to the Transferred Property provided to Purchaser by Seller or any other person or entity, including the Broker or any shareholder, member, manager, employee, agent, attorney or other person representing or purporting to represent Seller or the Broker.  Without limitation of the foregoing, subject to the provisions of Article VII, Purchaser specifically acknowledges and agrees that it has assumed the risk of changes in the condition of the Transferred Property between the Effective Date and the Closing Date and no adverse change in such condition shall grant Purchaser any right to terminate this Agreement or to obtain any damages against Seller.  IN ADDITION TO, AND WITHOUT LIMITATION OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY, TITLE, MARKETABILITY, FITNESS, OR SUITABILITY FOR A PARTICULAR PURPOSE OF THE TRANSFERRED PROPERTY, AND THE TRANSFERRED PROPERTY IS SOLD IN AN "AS IS", "WHERE IS" CONDITION, WITH ALL FAULTS.  BY EXECUTING THIS AGREEMENT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER AFFIRMS AND AGREES THAT (A) PURCHASER HAS NOT RELIED ON SELLER'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE, (B) SELLER MAKES NO WARRANTY THAT THE TRANSFERRED PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE, AND (C) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE TRANSFERRED PROPERTY.  PURCHASER HAS BEEN GIVEN THE OPPORTUNITY TO INSPECT THE TRANSFERRED PROPERTY AND HAS DETERMINED TO PURCHASE THE TRANSFERRED PROPERTY THEREOF BASED ON SUCH INSPECTION.

5.2.2   Without limiting the generality of the provisions of Section 5.2.1, Purchaser specifically acknowledges and agrees as follows:

**Exhibit B**

(a) · neither Seller nor any other party acting (or purporting to act) on behalf of Seller has made any representation or warranty of any kind of nature concerning any environmental condition existing at the Transferred Property; and

(b) Purchaser shall take title to the Transferred Property subject to any and all environmental conditions thereat, whether known or unknown, disclosed or undisclosed.

**5.3** **Reliance On Due Diligence.** PURCHASER ACKNOWLEDGES AND AGREES THAT:

(A) PURCHASER WILL BE RELYING ONLY ON ITS DUE DILIGENCE INSPECTIONS OF THE TRANSFERRED PROPERTY, AND THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS AGREEMENT IN PURCHASING THE TRANSFERRED PROPERTY; AND

(B) PURCHASER WILL NOT BE RELYING ON ANY STATEMENT MADE OR INFORMATION PROVIDED TO PURCHASER BY SELLER (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS AGREEMENT), SELLER'S LENDERS, OR ANY OF THEIR AFFILIATES, OR ANY OF THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, PARTNERS, TRUSTEES, BENEFICIARIES, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS, CONTRACTORS, CONSULTANTS, AGENTS OR REPRESENTATIVES, OR ANY PERSON PURPORTING TO REPRESENT ANY OF THE FOREGOING.

**5.4** **Survival**. This Article V shall survive the Closing.

### ARTICLE VI
### REPRESENTATIONS AND WARRANTIES

**6.1** **Seller's Representations and Warranties**. To induce Purchaser to enter into this Agreement and to consummate the transaction described in this Agreement, Seller hereby makes the express representations and warranties in this Section 6.1 as of the date hereof and as of the Closing Date, except to the extent that (x) any such representation or warranty is made as of a specific date and/or (y) the failure of any representation or warranty contained in Sections 6.1.4 (to the extent such failure does not have and is not reasonably likely to have a material adverse effect on the Transferred Property or Seller's ability to consummate the transaction described in this Agreement), 6.1.5(ii), 6.1.5(iii), or 6.1.9 to be true at Closing shall not result from a breach of covenant by Seller hereunder.

6.1.1 Organization and Power. Seller is duly incorporated or formed (as the case may be), validly existing, in good standing in the jurisdiction of its incorporation or formation, is qualified to do business in the jurisdiction in which the Transferred Property is located, and has all requisite power and authority to own the Transferred Property and to consummate the sale contemplated hereby with approval of the Bankruptcy Court.

6.1.2 Authority and Binding Obligation. Subject to Section 4.4, (i) Seller has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Seller, pursuant to this Agreement (the "**Seller Documents**"), and to

**Exhibit B**

perform all obligations of Seller, under each of the Seller Documents, (ii) the execution and delivery by the signer on behalf of Seller of the Seller Documents, and the performance by Seller of its obligations under each of the Seller Documents, has been duly and validly authorized by all necessary action by Seller, and (iii) each of the Seller Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller, enforceable against Seller, in accordance with its terms. The person executing this Agreement on behalf of Seller has the authority and power to bind Seller.

6.1.3   Consents and Approvals; No Conflicts. Subject to the Sale Order, (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Seller of any of the Seller Documents, or the performance by Seller of any of its obligations under any of the Seller Documents or the consummation by Seller of the transaction described in this Agreement, and (ii) neither the execution and delivery by Seller of any of the Seller Documents, nor the performance by Seller of any of its obligations under any of the Seller Documents, nor the consummation by Seller of the transaction described in this Agreement, will:  (A) violate any provision of Seller's organizational or governing documents; (B) violate any Applicable Law to which Seller or the Transferred Property is subject; or (C) result in the creation or imposition of any lien or encumbrance on the Transferred Property or any portion thereof.

6.1.4   Condemnation. Seller has not received any written notice and has no actual Knowledge of any pending condemnation proceeding or other proceeding in eminent domain.

6.1.5   Taxes. (i) all Taxes which are due and payable will be paid in full at Closing, (ii) Seller has no Knowledge of an audit of any Taxes which has not been resolved or completed, and (iii) Seller is not currently contesting any Taxes. The provisions of this Section 6.1.5 will survive the Closing for three (3) years.

6.1.6   Finders and Investment Brokers. Except for the Broker, Seller has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Seller in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

6.1.7   Foreign Person. Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

6.1.8   Bankruptcy. Seller is presently in bankruptcy in the Northern District of West Virginia.

6.1.9   Anti-Terrorism. Neither Seller nor any of Seller's Affiliates is or will be (i) conducting any business or engaging in any transaction or dealing with any Person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each, a "Prohibited Person"), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such

**Exhibit B**

Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

6.1.10 Ownership. Seller is the fee simple owner of the Transferred Property.

6.1.11 Environmental. Seller is not aware of any past or present release of Hazardous Substances at, on, under, migrating to or from, or surrounding the Transferred Property, and has not received any warning notices, notice of violations, administrative complaints, judicial complaints requests for information, or other formal or informal notices from any environmental or governmental agency or from any third party alleging that conditions at, on, under, migrating to or from, or surrounding the Transferred Property are in violation of any Environmental Laws, or that Seller is liable for any costs associated with any remediation relating to the existence of such materials at, on, under or migrating from the Transferred Property. Seller represents and warrants to Purchaser that no (i) underground tanks, vessels or containers or associated piping used currently or in the past for the management of Hazardous Substances, (ii) dumps, landfills or other units for the treatment or disposal of Hazardous Substances, (iii) PCBs, or (iv) asbestos-containing materials, in each case, are present at, on or under the Transferred Property, nor to Seller's knowledge have such features ever been present at, on or under the Transferred Property.

6.1.12 Notwithstanding the foregoing, if Purchaser has Knowledge of a breach of any representation or warranty made by Seller in this Agreement prior to Closing, and Purchaser nevertheless proceeds to close the transaction described in this Agreement, such representation or warranty by Seller shall be deemed to be qualified or modified to reflect Purchaser's Knowledge of such breach.

**6.2    Purchaser's Representations and Warranties**. To induce Seller to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 6.2, upon which Purchaser acknowledges and agrees that Seller is entitled to rely.

6.2.1 Organization and Power. Purchaser is duly incorporated or formed (as the case may be), validly existing and in good standing in the jurisdiction of its formation, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

**Exhibit B**

6.2.2  <u>Authority and Binding Obligation</u>.  (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "<u>Purchaser Documents</u>"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms.  The person executing this Agreement on behalf of Purchaser has the authority and power to bind Purchaser.

6.2.3  <u>Consents and Approvals; No Conflicts</u>.  (i) No filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and (ii) neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will:  (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

6.2.4  <u>Finders and Investment Brokers</u>.  Except for Broker, Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

6.2.5  <u>No Violation of Anti-Terrorism Laws</u>.  Neither Purchaser nor any of Purchaser's Affiliates is or will be (i) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

**Exhibit B**

Notwithstanding the foregoing, if Seller has Knowledge prior to Closing of a breach of any representation or warranty made by Purchaser in this Agreement and Seller nevertheless elects to close the transaction described in this Agreement, such representation or warranty by Purchaser shall be deemed to be qualified or modified to reflect Seller's Knowledge of such breach.

## ARTICLE VII
## COVENANTS

**7.1**    Confidentiality.

7.1.1    Disclosure of Confidential Information.  Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any information disclosed by the Inspections or the Purchaser Due Diligence Reports or any other documents, materials, data or other information with respect to the Transferred Property which is not generally known to the public or otherwise in the public domain (the "**Confidential Information**

7.1.2    ").  Notwithstanding the foregoing, Purchaser shall be permitted to (i) disclose any Confidential Information to the extent required under Applicable Law, and (ii) disclose any Confidential Information to any Person on a "need to know" basis, such as its partners, members, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, engineers, surveyors, lenders, investors, managers, franchisors and such other Persons whose assistance is required to consummate the transactions described in this Agreement; provided, however, that Purchaser shall (A) advise each such Person of the confidential nature of such Confidential Information, and (B) use commercially reasonable efforts to cause each such Person to maintain the confidentiality of such Confidential Information.

7.1.3    Public Announcements.    Subject to Section 4.4 and notwithstanding Section 7.1.1, neither Party shall have the right before Closing to make a public announcement regarding the transaction described in this Agreement; provided that any announcement made at or after Closing that includes the name(s) of Seller or Purchaser and/or any affiliates thereof shall require the written consent of Seller or Purchaser, as applicable, in its sole and absolute discretion.

7.1.4    Communication with Governmental Authorities.    Without limiting the generality of the provisions in Section 7.1.1, Purchaser shall not, through its officers, employees, managers, contractors, consultants, agents, representatives or any other Person (including, without limitation, Purchaser's Inspectors), directly or indirectly, communicate with any Governmental Authority or any official, employee or representative thereof, involving any matter with respect to the Transferred Property, unless required by Applicable Law; provided that the foregoing shall not limit or restrict Purchaser's right to (i) search and submit requests for public records and public databases via customary searches and (ii) request customary open permit, code violation, tax and lien searches and zoning verification letters.

7.1.5    Delivery of Purchaser Due Diligence Materials.  Purchaser shall deliver to Seller copies of all Purchaser Due Diligence Materials, for Seller's files.

**Exhibit B**

7.1.6   <u>Survival</u>. Purchaser's obligations under this Section 7.1 shall survive the termination of this Agreement.

**7.2   <u>Tax Contests and Clearance</u>.**

7.2.1   <u>Taxable Period Terminating Prior to Closing Date</u>. Seller shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings (the "<u>Property Tax Appeals Matters</u>"). In the event Purchaser receives any such refunds or abatements of Taxes to which Seller is entitled under this Section 7.2.1, Purchaser shall deliver such refunds or abatements to Seller within five (5) Business Days after Purchaser's receipt thereof. This Section 7.2.1 shall survive the Closing.

7.2.2   <u>Taxable Period Including the Closing Date</u>. Purchaser shall have the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which includes the Closing Date, and Purchaser and Seller shall be entitled to their pro rata share (based on their respective days of ownership during such taxable period) of any refunds or abatements of Taxes awarded in such proceedings after Purchaser has been reimbursed for its reasonable expenses of such proceedings.

7.2.3   <u>Taxable Period Commencing After Closing Date</u>. Purchaser shall have the right to commence, continue and settle any proceedings to contest Taxes for any taxable period which commences after the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. This Section 7.2.3 shall survive the Closing.

7.2.4   <u>Cooperation</u>. Seller and Purchaser shall use commercially reasonable efforts to cooperate with the Party contesting the Taxes (at no cost or expense to the Party not contesting the Taxes other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) and to execute and deliver any documents and instruments reasonably requested by the Party contesting the Taxes in furtherance of the contest of such Taxes. This Section 7.2.4 shall survive the Closing.

**7.3   <u>Further Assurances</u>.** From the Effective Date until the Closing or earlier termination of this Agreement, Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement. After the Closing, Seller and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement. The immediately preceding sentence of this Section 7.3 shall survive the Closing.

**Exhibit B**

## ARTICLE VIII
## CLOSING CONDITIONS

### 8.1   Purchaser Closing Conditions.

8.1.1   Satisfaction of Purchaser Closing Conditions.   Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent, unless one or more obligations are waived by Purchaser (the "Purchaser Closing Conditions"):

(a)   Seller's Deliveries.   All of the Seller Closing Deliveries shall have been delivered to Purchaser.

(b)   Representations and Warranties.   The representations or warranties of Seller in this Agreement shall be true and correct in all material respects as of the Closing (except to the extent that (x) any such representation or warranty is made as of a specific date and/or (y) the failure of any such representation or warranty pursuant to Sections 6.1.4, (to the extent such failure does not have and is not reasonably likely to have a material adverse effect on the Transferred Property or Seller's ability to consummate the transaction described in this Agreement), 6.1.5(ii), 6.1.5(iii), or 6.1.6 to be true at Closing shall not result from a breach of covenant by Seller hereunder).

(c)   Covenants and Obligations.   The covenants and obligations of Seller in this Agreement shall have been performed in all material respects.

(d)   Title.   Title to the Transferred Property shall be free and clear of all liens and other encumbrances other than Permitted Exceptions.

(e)   The Bankruptcy Court shall have entered the Sale Order.

### 8.2   Seller Closing Conditions.

(a)   Satisfaction of Seller Closing Conditions.   Seller's obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent, unless one or more obligations are waived by Seller (the "Seller Closing Conditions"):

(b)   Receipt of the Purchase Price.   Purchaser shall have (A) paid to Seller or deposited with Escrow Agent with written direction to disburse the same to Seller, the Purchase Price (as adjusted pursuant to Section 3.1 less the Deposit), and (B) delivered written direction to Escrow Agent to disburse the Deposit to Seller.

(c)   Purchaser's Deliveries.   All of the Purchaser Closing Deliveries shall have been delivered to Seller.

(d)   Representations and Warranties.   The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of

**Exhibit B**

the Closing (or as of such other date to which such representation or warranty expressly is made).

(e)    <u>Covenants and Obligations</u>.    The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

8.2.2    <u>Failure of Seller Closing Condition</u>.    If any of the Seller Closing Conditions is not satisfied at Closing, then Seller shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Deposit shall be disbursed to Seller in accordance with Section 3.2.2, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Seller Closing Conditions at or prior to Closing

## ARTICLE IX
## CLOSING

**9.1**    **Closing Date**.    The closing of the transaction described in this Agreement (the "**Closing**") shall take place at the offices of Kay Casto & Chaney PLLC, 1500 Chase Tower, 15th Floor, 707 Virginia Street, East, Charleston, WV 25301, or by overnight delivery and wire transfer, no later than thirty (30) days after the Business Day after all of the conditions to the obligations of the Seller and Purchaser under Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) have been satisfied or waived in accordance with this Agreement, or at such other time and place as agreed to in writing by the Parties (the "**Scheduled Closing Date**") (as such date may be postponed pursuant to Section 4.2.1 or 11.2) (the date on which the Closing actually occurs is referred to herein as the "**Closing Date**"); provided, that each of Purchaser and Seller may adjourn the Scheduled Closing Date as provided in Section 9.1.1 below.

9.1.1    <u>Extension of Closing Date</u>.    Each of Purchaser and Seller may adjourn the Scheduled Closing Date once, upon at least five (5) days' prior written notice to the other Party for a period of no more than fifteen (15) days; provided, however, that Seller shall have the right, but not the obligation, to postpone the Closing one or more times, but in no event for more than thirty (30) days in the aggregate from the Scheduled Closing Date; provided further, that TIME SHALL BE OF THE ESSENCE with respect to Purchaser's obligation to close the transactions contemplated herein no later than the Scheduled Closing Date, as same may be adjourned by Purchaser as provided above.

**9.2**    **Closing Deliveries**.

9.2.1    <u>Seller's Deliveries</u>.    At the Closing, Seller shall deliver or cause to be delivered to Purchaser all of the (i) documents set forth in this Section 9.2.1, each of which shall have been duly executed by Seller and acknowledged (if required), and (ii) other items set forth in this Section 9.2.1 (the "**Seller Closing Deliveries**"), as follows:

(a)    A closing certificate in the form of **Exhibit A**, together with all exhibits thereto;

**Exhibit B**

(b)    A limited warranty deed (the "**Deed**") in the form of **Exhibit B**, conveying the Transferred Property to Purchaser, subject to the Permitted Exceptions;

(c)    A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code; and

(d)    The Closing Statement prepared pursuant to Section 10.1;

(e    Such other documents and instruments as may be requested by the Title Company in order to consummate the transaction described in this Agreement.

9.2.2    Purchaser's Deliveries.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller all of the (i) documents set forth in this Section 9.2.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 9.2.2 (the "**Purchaser Closing Deliveries**"), as follows:

(a)    The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser, less the Deposit received by Seller;

(b)    A letter of direction to Escrow Agent directing Escrow Agent to disburse the Deposit to Seller;

(c)    A closing certificate in the form of **Exhibit C**, together with all exhibits thereto;

(d)    Such other documents and instruments as may be requested by the Title Company in order to consummate the transaction described in this Agreement.

## ARTICLE X
## PRORATIONS AND EXPENSES

**10.1**    **Closing Statement**.  At least five (5) Business Days prior to Closing, the parties jointly shall prepare a closing statement (the "**Closing Statement**"), which shall set forth their best estimate of the amounts of the items to be adjusted under this Agreement.  The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments shall be final with respect to the items set forth in the Closing Statement.  Notwithstanding the foregoing, if at any time within sixty (60) days after the Closing, any Party discovers any item which was omitted or incorrectly adjusted in the Closing Statement, such item shall be adjusted in the same manner as if their existence or such error had been known at the time of the preparation of the Closing Statement, and the Party in whose favor such original omission or error was made shall refund such difference to the other Party promptly after the original omission or error is discovered.  The preceding sentence of this Section 10.1 shall survive the Closing.

**10.2**    **Transaction Costs**.

10.2.1    Seller's Transaction Costs.  In addition to the other costs and expenses to be paid by Seller set forth elsewhere in this Agreement, Seller shall pay for the following items

**Exhibit B**

in connection with this transaction: (i) any commission or other compensation or consideration due to Broker; and (ii) the fees and expenses of its own attorneys, accountants, intermediaries, advisors and consultants.

10.2.2  Purchaser's Transaction Costs.  In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction: (i) the fees and expenses incurred by Purchaser for Purchaser's Inspectors or otherwise in connection with the Inspections; (ii) the cost to obtain the Title Commitment; (iii) any mortgage tax, and expenses for any loan title insurance policies, recording charges or other amounts payable in connection with any financing obtained by Purchaser; (iv) the fees and expenses for the Escrow Agent; (v) any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Transferred Property; and (vi) the fees and expenses of its own attorneys, accountants, intermediaries, advisors and consultants.

10.2.3  Other Transaction Costs.  All other fees, costs and expenses not expressly addressed in this Section 10.2 or elsewhere in this Agreement shall be allocated between Seller and Purchaser in accordance with applicable local custom for similar transactions.

10.2.4  This Section 10.2 shall survive the Closing.

## ARTICLE XI

## DEFAULT AND REMEDIES

**11.1    Seller's Default**.  If, on the Scheduled Closing Date, Seller fails to deliver good and marketable title to the Transferred Property, Seller fails to deliver all Seller Closing Deliveries, Seller fails to perform any of its covenants or agreements under this Agreement in any material respect, or Seller fails to deliver the Sale Order within 120 days (each, a "**Seller Default**"), and no Purchaser Default has occurred which remains uncured, then Purchaser, as its sole and exclusive remedy, may elect to (a) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without any reduction in or setoff against the Purchase Price, in which case Purchaser shall be deemed to have waived such Seller Default, or (iii) seek specific performance for the purchase of the Transferred Property.

**11.2    Seller's Right to Cure**.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall not have the right to exercise its remedies under Section 11.1 for a Seller Default, unless Purchaser has provided written notice to Seller specifying in reasonable detail the nature of the Seller Default, and Seller has not cured such Seller Default within fifteen (15) days after Seller's receipt of such notice (the "**Seller Cure Period**"), in which case the Closing shall be postponed until the date which is five (5) Business Days after the expiration of the Seller Cure Period.

**11.3    Purchaser's Default**.  If on the Scheduled Closing Date, Purchaser fails to perform any of its covenants or obligations under this Agreement in any material respect and no

**Exhibit B**

Seller Default has occurred which remains uncured (a "**Purchaser Default**"), then Seller, as its sole and exclusive remedy, may elect to terminate this Agreement by providing written notice to Purchaser, in which case the Deposit shall be disbursed to Seller in accordance with Section 3.2.2, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination.

11.4   **Purchaser's Right to Cure**.   Notwithstanding anything to the contrary in this Agreement, Seller shall not have the right to exercise its remedies under Section 11.3 for a Purchaser Default, unless Seller has provided written notice to Purchaser specifying in reasonable detail the nature of the Purchaser Default, and Purchaser has not cured such Purchaser Default within fifteen (15) days (or such longer period as is reasonably necessary to effect such cure) after receipt of such notice (the "**Purchaser Cure Period**"), in which case the Closing shall be postponed until the date which is five (5) Business Days after the expiration of the Purchaser Cure Period.

11.5   **LIQUIDATED DAMAGES**. THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 11.3 HEREOF, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT IF NOT IMPOSSIBLE TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLER SHALL RETAIN THE DEPOSIT AS FULL AND COMPLETE LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION; PROVIDED, HOWEVER, THAT IN ADDITION TO THE DEPOSIT, SELLER SHALL RETAIN ALL RIGHTS AND REMEDIES UNDER THIS AGREEMENT WITH RESPECT TO THOSE OBLIGATIONS OF PURCHASER WHICH EXPRESSLY SURVIVE SUCH TERMINATION.

**ARTICLE XII**
**CONDEMNATION**

12.1   **Condemnation**.   If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority issues a notice of condemnation or commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Transferred Property (a "**Condemnation**"), Seller shall give written notice of such Condemnation to Purchaser promptly after Seller receives notice of such Condemnation.

12.1.1 Material Condemnation.   If the Condemnation would result in the permanent loss of more than five percent (5%) of the fair market value of the Land or Improvements as reasonably determined by an appraisal of the Transferred Property, paid for by Seller (a "**Material Condemnation**"), then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) Business Days after Purchaser's receipt of Seller's written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser in accordance with Section 3.2.3, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Seller shall pay over and assign, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in all proceeds and awards from such

**Exhibit B**

Material Condemnation. If Purchaser fails to provide written notice of its election to Seller within such time period, then Purchaser shall be deemed to have elected to proceed to Closing pursuant to clause (B) of the preceding sentence. If the Closing is scheduled to occur within Purchaser's ten (10) Business Day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) Business Day election period.

12.1.2 <u>Non-Material Condemnation</u>. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall, without representation, warranty, covenant or recourse, pay over and assign, as applicable, to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Condemnation.

## ARTICLE XIII
## SURVIVAL, INDEMNIFICATION AND RELEASE

**13.1    Survival**. Except as expressly set forth in this Section 13.1, all representations, warranties, covenants, liabilities and obligations set forth herein shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

13.1.1 <u>Survival of Representations and Warranties</u>.    If this Agreement is terminated, the representations and warranties shall not survive such termination. If the Closing occurs, the representations and warranties set forth herein shall survive the Closing for a period commencing on the Closing Date and expiring at 5:00 p.m. (Eastern Time) on the date which is two hundred seventy (270) days after the Closing Date (the period any representation or warranty survives termination or the Closing as set forth in this Section 13.1.1

13.1.2  is referred to herein as the "<u>Survival Period</u>").

13.1.3 <u>Survival of Covenants and Obligations</u>. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

13.1.4 <u>Survival of Indemnification</u>. This Article XIII and all other rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**14.1    Notices**.

14.1.1 <u>Method of Delivery</u>.    All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal

**Exhibit B**

delivery, (ii) overnight internationally recognized courier service (e.g., Federal Express or UPS), or (iii) e-mail PDF transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i) or (ii), to the recipient Party at the following addresses:

        If to Seller:

        Emerald Grande, LLC
        Attn: William Abruzzino
        P.O. Box 190
        Bonita Springs, FL 34133-0190
        E-mail:

        With a copy to

        Kay Casto & Chaney, PLLC
        Attn: Steven L. Thomas
        P.O. Box 2013
        Charleston, WV 25327-2013
        E-mail: sthomas@kaycasto.com

        If to Purchaser:

        Wild Partners
        Attn: David Wild, President
        225W 1st N Street
        Morristown, TN 37814

        E-Mail: davida@wildbuilding.com

        With copy to:

        Spillman, Thomas & Battle
        Travis Eckley
        300 Kanawha Blvd. E
        Charleston, WV 25301

        14.1.2  Receipt of Notices.  All Notices sent by a Party (or its counsel pursuant to Section 14.1.4) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address of the recipient Party, by any of the methods set forth above provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or email address, and such recipient Party failed to provide the sending Party with its current address pursuant to Section 14.1.3.

14.1.3 <u>Change of Address</u>. The Parties and their respective counsel shall have the right to change their respective addresses for the purposes of this Section 14.1 by providing a Notice of such change in address as required under this Section 14.1

14.1.4 <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**14.2    Time Periods**. Notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**14.3    Assignment**. Purchaser shall not, directly or indirectly, by operation of law or otherwise, assign or delegate this Agreement or any interest therein or any rights or obligations hereunder to any Person, without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion. A transfer of any direct or indirect interests in Purchaser shall be deemed to constitute an assignment hereunder. Notwithstanding the foregoing, Purchaser shall have the right to designate any Affiliate as its nominee to receive title to the Transferred Property, or assign all of its right, title and interest in this Agreement to any Affiliate of Purchaser by providing written notice to Seller no later than five (5) Business Days prior to the Closing; provided, however, that (a) such Affiliate remains an Affiliate of Purchaser, and (b) such designation or assignment shall not be effective until Purchaser has provided Seller with a fully executed copy of such designation or assignment and assumption instrument, which shall (i) provide that Purchaser and its designee or assignee agree to pay any additional transfer tax as a result of such designation or assignment, and (ii) include a representation and warranty in favor of Seller that all representations and warranties made by Purchaser in this Agreement are true and correct with respect to such designee or assignee as of the date of such designation or assignment, and will be true and correct as of the Closing.

**14.4    Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**14.5    Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**14.6    GOVERNING LAW**. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF WEST VIRGINIA, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**14.7    Rules of Construction**. The following rules shall apply to the construction and interpretation of this Agreement:

14.7.1 Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

**Exhibit B**

14.7.2 All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement.  All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

14.7.3 The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

14.7.4 Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

14.7.5 The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

14.7.6 The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

14.7.7 The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**14.8**    **Severability**.  If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

**14.9**    **JURISDICTION AND VENUE**.  ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AND SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURTS, AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**14.10 WAIVER OF TRIAL BY JURY**.  EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER OR SELLER AT THE CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS

**Exhibit B**

(WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER TO THIS AGREEMENT OR THE TRANSFERRED PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT THE CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

14.11    **Prevailing Party**. If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Agreement against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred by the prevailing Party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Party; provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

14.12    **Incorporation of Recitals, Exhibits and Schedules**. The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 14.14) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

14.13    **Updates of Schedules**. Notwithstanding anything to the contrary in this Agreement, Seller shall have the right to amend and supplement any schedule, or provide a new schedule, to this Agreement from time to time without Purchaser's consent to the extent that (i) such schedule needs to be amended, supplemented, or provided to maintain the truth or accuracy of the applicable representation or warranty or the information disclosed therein, (ii) Seller did not have Knowledge as of the Effective Date of the matter being disclosed in such amendment, supplement, or new schedule, and (iii) such Schedule amendment does not impose any greater burden, liability or obligation upon Purchaser. If Seller makes any such amendment or supplement to the schedules, or provides such a new schedule, (an "Update"), then (A) such Update shall constitute a Purchaser Closing Condition Failure if, and only if, the corresponding representation or warranty to which such Update relates would be untrue or incorrect in the absence of such Update and such breach of representation or warranty results in a failure of the Purchaser Closing Conditions to be satisfied pursuant to Section 8.1.1(b) as of Closing, and (B) if Purchaser proceeds to Closing notwithstanding such Update, the corresponding representation or warranty to which such Update relates shall be deemed qualified by such Update for the purposes of limiting the defense and indemnification obligations of Seller under this Agreement.

14.14    **Entire Agreement**. This Agreement set forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**Exhibit B**

**14.15  Amendments, Waivers and Termination of Agreement**. Except as set forth in Section 14.13, no amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**14.16  Not an Offer**. The delivery by Seller of this Agreement executed by Seller shall not constitute an offer to sell the Transferred Property, and Seller shall have no obligation to sell the Transferred Property to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

**14.17  Execution of Agreement**. A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER**:

By: _____
Name: _____
Title: _____

**PURCHASER**:

WILD PARTNERS, a Tennessee General Partnership

By: _____
Name: _Logan A. Wild_____
Title: _Partner_____

**Exhibit B**